

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROSBY WILFREDO ORANTES-HERNANDEZ, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ALBERTO R. GONZALES, Attorney General of the United States, <br><br> Defendant. | CASE NO. CV 82-01107 MMM (VBKx) <br><br> ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR REVIEW OF MAGISTRATE'S DECISION RE PLAINTIFFS' MOTION TO COMPEL DOCUMENTS |

Plaintiffs filed this action in 1982, challenging practices and procedures allegedly employed by the Immigration and Naturalization Service ("INS") to detain, process and remove Salvadoran nationals who had entered the United States. Plaintiffs sued on their own behalf and on behalf of a class of "all citizens and nationals of El Salvador eligible to apply for political asylum . . . who . . . have been or will be taken into custody . . . by agents of the [Department of Homeland Security]." *Orantes-Hernandez v. Meese*, 685 F.Supp. 1488, 1491 (C.D. Cal. 1988), aff'd., 919 F.2d 549 (9th Cir. 1990) ("*Orantes II*"). Judge David Kenyon certified the *Orantes* class on April 30, 1982.[1]

---

[1]The class Judge Kenyon originally certified encompassed not only Salvadorans who had been or would be taken in custody and were eligible to apply for political asylum, but also Salvadorans who, subsequent to June 2, 1980, requested, or would in the future request, political

On April 29, 1988, Judge Kenyon entered a permanent injunction that mandated INS use of specific procedures when detaining, processing and removing Salvadoran immigrants. See *Orantes II*, 685 F.Supp. at 1511-13. On July 2, 1991, he modified the permanent injunction to add four conditions that applied solely to the Port Isabel Service Processing Center in Port Isabel, Texas ("*Orantes* injunction"). On September 28, 2004, the court entered a stipulated order clarifying the terms of the injunction to eliminate the possibility that the Office of Refugee Settlement could be held in violation of the *Orantes* injunction.[2]

On November 28, 2005, defendants filed a motion to dissolve the permanent injunction.[3] The government argues, *inter alia*, that the injunction is no longer necessary to ensure that detention centers comply with the injunction's directive that specific, procedural safeguards be provided for detained Salvadorans:

> "[T]he concerns of INS abuse that gave rise to the injunction are no longer well-founded. Since the entry of the injunction almost two decades ago, the INS and DHS have reviewed and reevaluated their immigration policies, and have reformed the way that they process, detain, and remove illegal aliens. . . . For most provisions of the injunction that once applied only to Salvadorans, INS and DHS, on their own accord, made the safeguards and protections available to aliens of all nationalities."[4]

---

asylum whose claims had not yet been presented or adjudicated. See *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 355 (C.D. Cal. 1982) (" *Orantes I*"). Plaintiffs later abandoned claims on behalf of this class. *Orantes II*, 685 F.Supp. at 1491.

[2] The Office of Refugee Settlement is an agency responsible for the care of unaccompanied alien children who are in federal custody due to their immigration status.

[3] The *Orantes* injunction enjoins "defendants, their agents and successors in office." See *Orantes II*, 685 F.Supp. at 1511. As a result, defendants concede that the injunction binds the Department of Homeland Security ("DHS") as successor to the INS, and its sub-agencies, Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"). It is these entities that have moved to dissolve the injunction.

[4] Defendants' Motion to Dissolve Permanent Injunction ("Defs.' Mot. Dissolve") at 2, 35.

2

The safeguards to which the government refers are set forth in ICE's national detention standards, which were drafted and implemented by defendants many years after the injunction was entered.[5]

The detention standards were developed by the former Immigration and Naturalization Service ("INS") in November 2000 in conjunction with the American Bar Association ("ABA"), the Department of Justice, and various organizations involved in advocacy for and pro bono representation of immigration detainees. The standards governed the INS' operation of detention facilities for aliens apprehended for illegally entering the United States. Today, ICE routinely measures detention facility compliance with thirty-eight detention standards. The government argues that seven of the standards parallel certain provisions in the *Orantes* injunction, and that these standards, which are monitored by ICE, obviate the need for court supervision of ICE practices via the injunction.[6]

Following a telephonic conference on December 21, 2005, the court found that "plaintiffs were entitled to limited discovery . . . regarding detention conditions and the burden placed on the government by the injunction."[7] Plaintiffs' first set of document requests sought reports generated from 2001 to the present by the ABA and the United National High Commissioner for Refugees ("UNHCR") concerning the government's compliance with the ICE detention standards.[8] Plaintiffs also requested all Department of Homeland Security ("DHS") documents concerning detention standards compliance, including facilities monitoring reports ("facility reviews").

---

[5]*Id.* at 14.

[6]*Id.* at 15-20.

[7]Telephone Status Conference and Case Management Order, Dec. 21, 2005.

[8]Plaintiffs represent that the ABA and UNHCR are the only non-governmental agencies that report government compliance with ICE National Detention Standards after in-person visits to detention facilities and interviews with facility staff and detainees. None of the reports is available to the public. (Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Review of Magistrate's Decision Re Plaintiffs' Motion to Compel Documents ("Pls.' Mot.") at 2 n. 1).

In response, the government produced documents that reflected compliance with seventeen of the thirty-eight standards from January 1, 2004 to the present.[9] Plaintiffs moved to compel the production of documents covering a broader time frame and additional standards. Specifically, plaintiffs sought (1) ABA and UNHCR monitoring reports, as well as DHS documents other than facility reviews, for the period from January 1, 2001 to the present; (2) DHS facility reviews for a sample of ten detention facilities for the period from January 1, 2002 through December 31, 2003; and (3) documents regarding all detention standards.

After hearing arguments on plaintiffs' motion to compel, Magistrate Judge Victor B. Kenton issued an order on May 10, 2006 that (1) granted plaintiffs' motion to compel documents for the period from January 1, 2001 to the present; (2) ordered the government to produce DHS monitoring reports for a sample of ten facilities for the period from January 1, 2002 through December 31, 2003; and (3) denied plaintiffs' request for discovery on additional detention standards other than those the government had previously produced.[10]

Plaintiffs seek reconsideration of Judge Kenton's decision to limit discovery to the seventeen ICE detention standards deemed relevant by the government. They request that the court order production regarding eight additional standards: (1) Use of Force; (2) Medical Care; (3) Terminal Illness, Advanced Directives, and Death; (4) Suicide Prevention and Intervention; (5) Hunger Strikes; (6) Food Service; (7) Religious Practices; and (8) Hold Rooms in Detention Facilities. Judge Kenyon's denied discovery regarding these standards on relevance grounds.

_____

[9]The seventeen standards for which the government has produced documents address visitation, telephone access, access to legal material, the special management unit (disciplinary and administrative segregation), group presentations on legal rights, staff-detainee communication, correspondence and other mail, the detainee classification system, detainee grievance procedures, the detainee handbook, funds and personal property, recreation, detainee transfers, post orders, and disciplinary policy.

[10]Amended Decision Re: Plaintiffs' Motion to Compel Production of Documents ("Kenton Order"), May 10, 2006, Declarations and Exhibitions in Support of Plaintiffs' Motion for Review of Magistrate's Decision Re Plaintiffs' Motion to Compel Documents ("Pls.' Exh."), Exh. 1.

# I. DISCUSSION

## A.  Legal Standard For Review Of Magistrate Judge's Order

A magistrate judge has authority to hear matters that are not dispositive of a claim or defense.  See FED.R.CIV.PROC. 72.  These include discovery motions.  See *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1414 (9th Cir. 1991) ("Nondispositive issues include discovery sanctions"); *Hoar v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) ("Matters concerning discovery generally are considered 'nondispositive' of the litigation").  Under Rule 72(a), a party may serve and file objections to a magistrate judge's order that concerns a nondispositive pretrial matter "[w]ithin 10 days after being served with a copy of the magistrate judge's order." FED.R.CIV.PROC. 72(a); see CA CD L.R. 72-2.1 ("Any party objecting under F.R.Civ.P. 72(a) to a Magistrate Judge's ruling on a pretrial matter not dispositive of a claim or defense must file a motion for review . . . within ten (10) days of an oral ruling which the Magistrate Judge indicates will not be followed by a written ruling, or within ten (10) days of service of a written ruling").

Normally, a magistrate judge's order can be reversed by the district court only if it is "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); FED.R.CIV.PROC. 72(a); *Bhan*, 929 F.2d at 1414.  The clearly erroneous standard, which applies to a magistrate judge's findings of fact, is "significantly deferential, requiring 'a definite and firm conviction that a mistake has been committed.'" *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993); see *Security Farms v. International Brotherhood of Teamsters*, 124 F.3d 999, 1014 (9th Cir. 1997); see also *Grimes v. City and County of San Francisco*, 951 F.2d 236, 240 (9th Cir. 1991) (holding that discovery sanctions are non-dispositive pretrial matters that are reviewed for clear error under Rule 72(a)).  By contrast, "[t]he 'contrary to law' standard . . . permits independent review of purely legal determinations by the magistrate judge." *F.D.I.C. v. Fidelity & Deposit Co. of Md.*, 196 F.R.D. 375, 378 (S.D. Cal. 2000) (citing *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (3d Cir. 1992) ("[T]he phrase 'contrary to law' indicates plenary review as to matters of law")); see *Med. Imaging Centers of America, Inc. v. Lichtenstein*, 917 F.Supp. 717, 719 (S.D. Cal. 1996) ("Section 636(b)(1) . . . has been interpreted to provide for

*de novo* review by the district court on issues of law").

Where a party challenges a magistrate judge's order regarding the relevance of requested discovery, however, a slightly different standard of review applies because "issues of relevancy . . . are traditionally left to the discretion of the trial court." *Geophysical Systems Corp. v. Raytheon Co., Inc.*, 117 F.R.D. 646, 647 (C.D. Cal. 1987); see *Liew v. Breen*, 640 F.2d 1046, 1049 (9th Cir. 1981) (in general, "[d]eterminations of relevance in discovery matters are left to the trial court's discretion and will not be reversed absent abuse of discretion," citing *Data Disc, Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977)). Thus, in reviewing a magistrate's order regarding the relevance of discovery sought by a party, the district court should apply "the clearly implicit standard of abuse of discretion," rather than "the explicit statutory standard" of clearly erroneous or contrary to law. *Geophysical Systems Corp.*, 117 F.R.D. at 647; see also *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F.Supp.2d 1164, 1168 n. 2 (C.D. Cal. 1998) ("Because 'issues of relevancy . . . are traditionally left to the discretion of the trial court,' such issues do not come under the 'clearly erroneous' standard set forth in § 636(b)(1)(A)," quoting *Geophysical Systems Corp.*); *Wolpin v. Philip Morris Inc.*, 189 F.R.D. 418, 422 (C.D. Cal. 1999) ("The standard of review with respect to discovery requests presents a special case, however. Where the magistrate's decision concerns an evidentiary question of relevance . . . the standard of review in most instances is not the explicit statutory standard, but the clearly implicit standard of abuse of discretion," quoting *Geophysical Systems Corp.*); *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the High Court of Justice, Chancery Division, England*, 147 F.R.D. 223, 225 (C.D. Cal. 1993) ("Discovery rulings by a Magistrate Judge are reviewed by this court under the implicit standard of abuse of discretion").

Under an abuse of discretion standard, a judge's order should be reversed only if "'his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision.'" *Wolpin*, 189 F.R.D. at 422 (quoting *Premium Serv. Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 255, 229 (9th Cir. 1975)). In the context of a magistrate judge's decision regarding the relevance of discovery, the district court

should "review the . . . order with an eye toward the broad standard of relevance in . . . discovery. . . ." *Geophysical Systems Corp.*, 117 F.R.D. at 647.

Under Rule 26, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to a claim or defense of any party." FED.R.CIV.PROC. 26(b)(1). Although the current version of Rule 26 limits discovery to items that are relevant to a "claim or defense," it does not require that the information or documents discovered be admissible at trial. See *id.* ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence"). Relevance is broadly construed, and "a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party. . . . [Stated differently,] [a] request for discovery should be allowed unless it is clear that the information sought can have no possible bearing on the claim or defense of a party." *McCormick v. City of Lawrence, Kansas*, No. 02-2135-JWL, 2005 WL 1606595, *5 (D. Kan. July 8, 2005); see also *Directv, Inc. v. Richards*, No. Civ. 03-5606(GEB), 2005 WL 1514187, *3 (D.N.J. June 27, 2005) ("The relevancy requirement has been construed broadly and liberally in order to ensure mutual knowledge of all relevant facts," citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (explaining that a relevant matter is "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case")); *Caldwell v. Center for Correctional Health and Policy Studies, Inc.*, No. Civ.A. 03-1464GK/JMF, 2005 WL 1313507, *2 (D.D.C. June 2, 2005) (noting that "[t]he sea change created by the amendment to Rule 26(b)(1) was to expand discovery from information that is in fact relevant to a claim or defense to information that may not, in itself, be relevant but is readily calculated to lead to the discovery of information that is," and stating that the "question . . . is . . . whether, at the time it was sought, there was a reasonable likelihood the information might yield such relevant evidence").

## B.    Plaintiffs' Relevance Arguments

Plaintiffs offer two arguments in support of their contention that documents regarding all of the ICE detention standards are relevant. First, they assert that Judge Kenton based his decision on an overly restrictive reading of the *Orantes* injunction's prohibition on the use of

"threats, misrepresentation, subterfuge, or other forms of coercion." Second, they contend that evidence regarding the government's compliance, or noncompliance, with standards that *do not* incorporate provisions of the injunction is the best indicator as to whether the government will comply with standards that *do* incorporate provisions of the injunction if it is dissolved.

### 1. Whether Judge Kenton's Decision Was Based On An Overly Restrictive Reading Of The *Orantes* Injunction

The *Orantes* injunction requires that "[d]efendants . . . not employ threats, misrepresentation, subterfuge or other forms of coercion, or in any other way attempt to persuade or dissuade class members when informing them of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b)."[11] This general prohibition is followed by a non-exhaustive list of prohibited practices.[12]

It is undisputed that the eight detention standards at issue fall outside the list of prohibited practices. Plaintiffs argue, however, that the general prohibition on the use of coercion prevents the government from creating a coercive environment through (a) inappropriate use of physical force or hold rooms or (b) deprivation of medical care, adequate food, or opportunities for religious observance. Judge Kenton rejected this argument, reasoning that the determinative question was whether the injunction was designed to prohibit practices governed by the eight standards that are in dispute. Judge Kenton concluded that it did not.[13]

The question is whether Judge Kenton erred in limiting the scope of discovery to the coercive practices that led to issuance of the *Orantes* injunction. During the telephonic hearing in which the court granted plaintiffs discovery, it asked the government:

"You say the Court's focus here ought to be, and the premise of the motion is that there's no reason to treat Salvadorans differently any more. Is that really the focus

---

[11]Modified Permanent Injunction, *Orantes-Hernadez v. Thornburgh*, CV 82-1107 KN (July 2, 1991) ("*Orantes* Injunction"), ¶ 1.

[12]*Id.* ("The prohibited acts include, but are not limited to. . .").

[13]See Kenton Order at 5 (finding that "none of the additional 8 categories have a sufficiently close or direct relationship to the content of the injunction to merit discovery").

of what the Court ought to be looking at, or should the Court be looking at whether the constitutional violations or activities that Judge Kenyon found warranted the imposition of this injunction continue to exist such that the injunction should continue to exist? . . . Well, so wouldn't I be looking at whether the things that caused the injunction to be put into place in the first instance continue to exist?"[14]

Near the end of the hearing, the court noted that it was focused on "the particular specific unconstitutional practices that warranted the entry of the injunction in the first place," and "whether the things that the injunction was designed to remedy are any longer problems that [Salvadorans] face."[15]  It was to address this issue that the court granted plaintiffs limited

[14]Kenton Order at 2 (quoting Telephonic Conference, Dec. 21, 2005, at 36-37); see also Reporter's Transcript, Dec. 21, 2005 ("Dec. 21, 2005 RT") at 15-16 ("[I]f the injunction was entered in the first place to prevent the kinds of coercive activities relating to asylum hearings that Mr. Joaquin is alluding to, then why would it not be relevant to whether the injunction should stay in place, that those same types of alleged coercive activities are still going on?");  *id.* at 24 ("[W]hat we're looking at is if there was no injunction in place . . . then would the[ ] same things that happened to [Salvadorans] before the injunction begin to happen to them again?").

[15]Kenton Order at 3 (quoting Dec. 21, 2005 RT at 29).  The government asserted that the court was misapplying the standard for dissolution of an injunction; it noted that the issue was not whether it had complied with the injunction, but whether changed conditions warrant dissolution of the injunction.  The government is clearly correct regarding the standard to be applied.  See, e.g., *Securities and Exchange Comm. v. Coldicutt*, 238 F.3d 939 (9th Cir. 2001) ("As we stated in *SEC v. Worthen*, 98 F.3d 480, 942-43 (9th Cir. 1996), obedience to a mandate 'provides no justification for dissolving the injunction. Compliance is just what the law expects.' This is not to say, however, that a lengthy period of compliance should be given no consideration. Indeed, in *Worthen*, we held that 'Worthen had not shown that the mere passage of time constituted a significant change in circumstances justifying relief.' We did not foreclose consideration of the passage of time in combination with other relevant factors" (citations omitted)); *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000) ("A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction"); *Bellevue Manor Assoc. v. United States*, 165 F.3d 1249, 1255 (9th Cir. 1999) ("*Rufo* [*v. Inmates of Suffolk County Jail*, 502 U.S. 367, 376, (1992),] . . . set out a new, more flexible standard: There must be 'a significant change in facts or law [that] warrants revision of the decree,' and 'the proposed modification [must be] suitably tailored to the changed circumstance'").  In its motion to dissolve, however, the government argues that Salvadorans do not face the same coercive conditions today that they did when the injunction was entered *because* ICE had adopted detention standards that eliminated or ameliorated those conditions. The court intended by its comments to suggest that, in order to

discovery regarding detention conditions and the detention standards.

At a second telephonic conference on January 13, 2006, the court stated that it had "attempt[ed] [in the earlier conference] to set broad parameters for discovery so that Judge Kenton [could] handle the individual disputes with reference to those broad parameters."[16] Given that the court's "broad parameters" focused on "the particular specific unconstitutional practices that warranted the entry of the injunction in the first place," Judge Kenton acted well within his discretion in deciding to limit the scope of discovery to the unconstitutional practices that led Judge Kenyon to enter the *Orantes* injunction in the first place.

The next question is whether Judge Kenton abused his discretion by concluding that the eight detention standards at issue on this motion are not relevant in assessing the government's argument that it no longer engages in the practices that warranted issuance of the *Orantes* injunction.

### a.    Use Of Force Detention Standard

The detention standard on Use of Force provides that physical force is to be used "only after all reasonable efforts to resolve a situation have failed"[17] and specifies standards and procedures for the use of physical force against detainees. Among other controls, it requires that only the amount of force necessary to gain control of a situation be used. It also mandates a supervisor to be present when force is used, except in "immediate-use-of-force" situations.[18]

After reviewing the documents submitted by the parties, Judge Kenton concluded that nothing in record indicated that Judge Kenyon was concerned with coercion through the use of

---

evaluate whether implementation of the detention standards was a changed circumstance that justified dissolving the injunction, the court would have to examine whether the detention standards in place today have in fact eliminated those practices, or whether they continue to exist despite adoption of the standards. It did not intend to suggest, as the government asserted during the hearing, that compliance with the injunction was an element of the analysis.

[16]*Id.* at 4 (quoting Reporter's Transcript, Jan. 13, 2006 ("Jan. 13, 2006 RT") at 6).

[17]Pls.' Exh. 3 (INS Detention Standard on Use of Force, Sept. 20, 2000).

[18]*Id.*

physical force.[19] In reaching this conclusion, Judge Kenton considered persuasive the *Orantes* injunction's failure to mention physical force. During the hearing, he stated:

> "There's absolutely nothing that I see in this injunction that – whatever the history of it was, and I've got to figure that if there was an issue of use of physical force, that would have shown up in the injunction. I mean, that seems pretty patent to me. Nothing shows up. These are all verbal things, or, for the most part, misrepresentations, lack of providing information, lack of providing telephones, all that sort of thing." [20]

Plaintiffs argue that physical force in fact was an issue before Judge Kenyon, citing two passages in the *Orantes I* opinion. In the first, plaintiff Crosby Orantes-Hernandez describes his arrest by INS agents: "My companion ran immediately but the agent grabbed me by the arm and twisted it behind my back. He threw me against the van and held me by the arms while a second agent took out his revolver and struck me very hard in the face, twice." *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 359 (C.D. Cal. 1982) (" *Orantes I*"). The second passage recounts plaintiff Adelso Salome Flores' recollection of his arrest: " . . . [S]uddenly a man dressed in civilian clothes came running up to me. When I saw him, he caught me by surprise and in that instant I pulled away. But, from behind, a Black man, also dressed in civilian clothing, pushed me. Together they hit me in the face and legs to make me fall, finally throwing me to the ground." *Id.* These are the sole references to physical force in the three *Orantes* opinions. See *Orantes I*, 541 F.Supp. at 351; *Orantes II*, 685 F.Supp. at 1488; *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990) ("*Orantes III*").

These incidents took place at the time of arrest, rather than during detention. The

---

[19]See Kenton Order at 5 ("Having considered the documentation presented to the Court, it does not appear that use of physical force was ever an issue leading up to the issuance of the permanent injunction").

[20]Reporter's Transcript, May 9, 2006 ("May 9, 2006 RT"), Defendants' Opposition to Plaintiffs' Motion for Review of Magistrate's Decision re Plaintiffs' Motion to Compel Documents ("Def.'s Opp."), Exh. A at 12:3-12.

detention standard, of course, applies to post-arrest detention, and not to activities incident to arrest.[21]  Therefore, even if these incidents influenced Judge Kenyon's decision to enter a preliminary injunction, the detention standard regarding Use of Force would not assist in determining whether the injunction should be dissolved.

Moreover, read in context, it is clear that the *Orantes* court recounted these two instances of physical force to explain why many Salvadorans were in a "subdued" state when presented with the option of accepting voluntary departure and waiving their claims to asylum.  See *Orantes I*, 541 F.Supp.at 351 ("The process of securing a voluntary departure agreement begins with the initial, sometimes abusive, contact between the INS agent and the apprehended Salvadoran. Without in any way passing judgment on the conduct of INS agents in the individual situations, the Court believes the consideration of the circumstances of the arrests from the arrestees' point of view is essential to an understanding of the subdued state of many Salvadorans at the time they accept voluntary departure").

The *Orantes* court's focus on forms of coercion other than physical force is further evidenced by its efforts to define "coercion" in the context of the case:

"Turning to the merits of this claim, plaintiffs' success depends on their ability to demonstrate a 'pattern or practice' of coercive conduct rather than 'isolated incidents.' . . . Coercion is a word capable of many meanings, and it is important to understand the context in which plaintiffs' claims arise.  The evidence before the Court establishes that Salvadorans are often frightened and confused at the time of their arrest and interrogation by the INS. . . .  In this environment, 'coercion' is not limited to physical force or outright threats.  The courts on numerous occasions have recognized that the more subtle effects of atmosphere, setting, and the

---

[21]Plaintiffs note that the injunction's prohibition on coercion "concerns not only the initial point of processing where class members are offered voluntary departure, but rather extends generally to the subsequent period of detention." (Pls.' Mot. at 6:13-15).  While this is correct, it has no bearing on whether Judge Kenton properly denied discovery concerning the detention standard on Use of Force.

omission of certain statements or advice may have an equally coercive effect." *Id.* at 372-73.

A careful review of the *Orantes* opinions supports Judge Kenton's conclusion that the use of physical force during post-arrest detention was not among the forms of coercion that led to issuance of the *Orantes* injunction. Therefore, Judge Kenton did not abuse his discretion in denying plaintiffs' motion to compel discovery on the Use of Force detention standard.

### b.    Detention Standards Governing Health, Food Service, And Religious Practices

Plaintiffs next seek reconsideration of Judge Kenton's decision to deny discovery on the detention standards governing (1) Medical Care, (2) Terminal Illness, Advance Directives, and Death; (3) Suicide Prevention and Intervention; (4) Hunger Strikes; (5) Food Service; and (6) Religious Practices. These standards require that detainees have access to medical services and nutritious meals, and set out specific procedures for the care of detainees with terminal illnesses and suicidal tendencies.[22] The detention standard on Hunger Strikes requires detention facility staff to monitor the health of, and provide medical care to, detainees on hunger strikes.[23] The Food Service standard sets out the government's policy on the provision of special medical and religious meals.[24] The Religious Practices standard prohibits facility staff from "disparag[ing] the religious beliefs of a detainee" or "coerc[ing] or harass[ing] a detainee to change religious affiliation."[25]

Judge Kenton denied discovery regarding the government's compliance with these standards, finding that there was no "substantial relationship" between the standards and the

---

[22]Pls.' Exh. 4 (INS Detention Standard on Medical Care, Sept. 20, 2000); Pls.' Exh. 5 (INS Detention Standard on Terminal Illness, Advance Directives, and Death); Pls.' Exh. 6 (INS Detention Standard on Suicide Prevention and Intervention).

[23]Pls.' Exh. 7 (INS Detention Standard on Hunger Strikes, Sept. 20, 2000).

[24]Pls.' Exh. 8 (INS Detention Standard on Food Service, Sept. 20, 2000).

[25]Pls.' Exh. 9 (INS Detention Standard on Religious Practices, Sept. 20, 2000).

"language contained in the permanent injunction itself."[26] Plaintiffs do not attempt to show that the *Orantes* court considered coercive practices covered by these standards. Rather, they argue that lack of medical care and food can create coercive detention conditions that discourage Salvadorans from pursuing asylum claims.

Because the court's order permitting limited discovery was focused on ascertaining whether the violations that justified entry of the *Orantes* injunction continue to exist today in ICE detention centers– i.e., whether the existence of and compliance with the ICE detention standards constitute significant changed circumstances – Judge Kenton did not abuse his discretion in denying discovery regarding detention standards covering medical care, terminal illness, advance directives, and death; suicide prevention and intervention; hunger strikes; food service; and religious practices.

### c.    Detention Standard On Hold Rooms In Detention Facilities

The detention standard on Hold Rooms in Detention Facilities governs the use of hold rooms for the "temporary detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of the facility."[27] The standard requires that detainees not be placed in hold rooms for more than 12 hours, and prohibits the government from holding unaccompanied minors, elderly individuals, families, and females with children there.[28] It prohibits officers from carrying "firearms, OC spray, baton or other non-deadly force devices into the hold room." Additionally, it requires that detention facility staff provide meals to adults who are placed in hold rooms for more than six hours and to juveniles regardless of the time in custody.[29] During the May 9, 2006 hearing before Judge Kenton, the government explained that hold rooms are used solely for individuals awaiting removal, transfer,

---

[26]Kenton Order at 5.

[27]Pls.' Exh. 10 (INS Detention Standard on Hold Rooms in Detention Facilities, Sept. 20, 2000).

[28]*Id.*

[29]*Id.*

hearings, medical treatment, other intrafacility movement, or for individuals being processed in and out of the facility.[30] They are not used for disciplinary purposes.[31]

Judge Kenton denied discovery on the Hold Rooms detention standard, finding that "there [was] not a reasonable relationship between the detention for disciplinary charges, or the disciplinary process, which are matters addressed in the injunction, and the use of hold rooms in detention facilities."[32] Plaintiffs counter that Judge Kenton took an overly narrow view of the scope of the injunction and the use of hold rooms. They note that the injunction addresses the use of threats, misrepresentation, or other forms of coercion at the time Salvadorans are processed into detention as well as during their detention period. Because detainees may be held in hold rooms during initial processing into a facility, plaintiffs reason, the government's use of threats during this time goes directly to the injunction's prohibitions.

A review of the Hold Rooms detention standard shows that information regarding government compliance with the standard will not be relevant in assessing whether Salvadorans are being threatened or coerced into giving up asylum claims. The monitoring instrument for this detention standard includes twenty-five questions designed to assess compliance. The first nine concern the location and physical condition of the hold rooms – whether they are well ventilated, at least thirty square feet, and contain seating, bunks, toilets, and floor drains. Nine other questions concern the treatment of detainees while they are held in the rooms – whether they are held for more than twelve hours, whether males and females are segregated, and whether detainees are allowed meals, basic hygiene items, and access to toilets. Other questions on the monitoring instrument ask whether officers conduct patdown searches for weapons before detainees are placed in hold rooms, whether officers are permitted to enter the hold rooms with weapons, and whether there is a written evacuation plan and appropriate emergency service in

---

[30]May 9, 2006 RT at 34:18-22.

[31]*Id.* at 32:23-33:7, 33:13-17.

[32]Kenton Order at 7.

15

place.[33]

Plaintiffs argue that the Hold Rooms standard protects at least one type of coercion specifically addressed in Judge Kenyon's orders - the mixing of male and female detainees. Plaintiffs cite the testimony of plaintiff Dora Elia Estrada, who stated: "The INS official told me that I could not get political asylum in the United States, and that I would have to remain in jail for a long period of time. Moreover, he told me that I would be placed in a cell with men, leaving me with the impression that I would be sexually molested." *Orantes I*, 541 F.Supp. at 360. Judge Kenyon recounted this testimony as an example of the "variety of techniques used by INS agents to obtain consent to voluntary departure." *Id.* at 359-60. Question twelve on the monitoring instrument asks (1) "Are male and females segregated at all times?" and (2) "If they claim to be married?"[34] The court need not resolve whether these inquiries would address the type of coercion Judge Kenyon noted because the hold rooms are used to house detainees being transferred into and out of the detention facility. Judge Kenyon specifically noted that INS practices regarding transfer of detainees from the point of arrest to remote detention facilities served to isolate the detainees and increase the coercive nature of the atmosphere they confronted. See *Orantes II*, 685 F.Supp. at 1500 ("Class members, where transferred, have been deprived of food and kept incommunicado for extended periods of time. It is common that INS deprives class members of address books and telephone numbers in the course of transfer, such that transfer serves to place them completely out of touch with friends and relatives who could assist them"); see also *id.* at 1501 ("Pressure by individual IDOs upon Salvadorans to return to El Salvador is augmented by the orientation presentation made by DSOs to newly arrived Salvadoran and Guatemalan detainees at Port Isabel, who are isolated and quarantined until they have had a medical examination. They are segregated from the regular detainee population in Building 39 where they receive an orientation"). Because detainees are placed in the hold rooms, *inter alia*,

---

[33]Pls. Exh. 10 (INS Detention Standard on Hold Rooms in Detention Facilities, Sept. 20, 2000).

[34]*Id.*

16

when transferring into a facility, the government's compliance with the Hold Rooms standard is relevant in assessing whether the ICE detention standards constitute a changed circumstance that warrants dissolution of the injunction. As a result, the court reverses Judge Kenton's decision to deny plaintiffs discovery of documents regarding the Hold Rooms detention standard.

> **2.    Whether The Government's Compliance Or Non-Compliance With Detention Standards That Govern Practices Or Conditions *Not* Addressed In The *Orantes* Injunction And Judge Kenyon's Decisions Is Relevant**

Plaintiffs argue finally that the government's compliance or non-compliance with detention standards *not* addressed in Judge Kenyon's opinions and/or the *Orantes* injunction is relevant in assessing the government's motion to dissolve. Noting that such standards are not legally enforceable, plaintiffs reason that if the government nonetheless complies with them, it is also likely to comply with standards that incorporate provisions of the injunctive order if it is dissolved. Judge Kenton rejected this argument.[35]

The court is no more persuaded by plaintiffs' argument than was Judge Kenton. Plaintiffs were granted limited discovery to address the arguments set forth in the government's motion. The government argued that, following issuance of the injunction, it had promulgated detention standards that required it to engage in much of the conduct that the injunction mandated. Thus, the proper focus of plaintiffs' discovery is the provisions of the injunction and whether the detention standards obviate the need for any of the injunctive requirements. While it is true that the injunction broadly enjoins "threats, misrepresentations, subterfuge or other forms of coercion," these terms must be interpreted in light of the evidence before Judge Kenyon at the time. Allowing plaintiffs to conduct discovery regarding the government's efforts to comply with non-enforceable guidelines that relate to matters not addressed in the injunction will not advance

---

[35]May 9, 2006 RT at 12:18-23 ("If none of that was involved back in the 1980's and in the 1991 injunction, none of that was brought into the court's injunction, then other than your theory that says let's look at other stuff because other stuff that's not involved also shows us how they're going to comply with the stuff that is involved, which I don't buy").

17

the inquiry regarding the continued need for the injunction. Rather, it will provide opportunity for a fishing expedition regarding ICE's detention and removal practices.[36]

## II. CONCLUSION

For the foregoing reasons, the court concludes that Judge Kenton did not abuse his discretion in denying plaintiffs' motion to compel discovery of documents related to the ICE detention standards regarding Use of Force; Medical Care; Terminal Illness, Advance Directives, and Death; Suicide Prevention and Intervention; Hunger Strikes; Food Service; and Religious Practices. Plaintiffs' motion for reconsideration of Judge Kenton's order is denied to the extent it seeks discovery regarding these standards. Plaintiffs' motion is granted insofar as it seeks discovery on the Hold Rooms in Detention Facilities standard.

DATED: October 13, 2006

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

___

[36]Throughout their briefs, plaintiffs cite articles and portions of UNHCR reports that suggest the government has violated various of the detention standards. They report, for example, that one detainee, Mr. E-, withdrew his appeal of the government's removal order because "he ha[d] suffered in the jail and [was] desperate to be released." Mr. E, who is diabetic, told interviewers that "[h]is primary concern at the facility [were] poor food and poor medical care." (Pls.' Exh. 13 at 225, Bates no. D008551). These accounts do not assist plaintiffs. The court has limited discovery to the circumstances that led to entry of the *Orantes* injunction, and whether there has been a change in those circumstances.