cc: Judge Kenton

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CROSBY WILFREDO ORANTES-HERNANDEZ, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>ERIC HOLDER, Attorney General of the United States, *et al.*,<br><br>Defendants. | ) | CASE NO. CV 82-01107 MMM (VBKx)<br><br>ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER; CONSTRUING PLAINTIFFS' APPLICATION AS A MOTION TO COMPEL DISCOVERY; GRANTING PLAINTIFFS' MOTION TO COMPEL DISCOVERY |

Plaintiffs filed this class action in 1982, challenging practices and procedures allegedly employed by the Immigration and Naturalization Service ("INS")[1] to detain, process, and remove Salvadoran nationals who had entered the United States. Plaintiffs sued on their own behalf and on behalf of a class of "all citizens and nationals of El Salvador eligible to apply for political asylum . . . who . . . have been or will be taken into custody . . . by agents of the [Department of Homeland Security]." *Orantes-Hernandez v. Meese*, 685 F.Supp. 1488, 1491 (C.D. Cal.

[1]In 2002, Congress passed the Homeland Security Act of 2002. Pub.L. No. 107-296, 116 Stat. 2153. The act dissolved the INS and created the Department of Homeland Security ("DHS") as well as several subagencies, including Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"), which took over the INS' law enforcement functions.

1988) ("*Orantes II*"), aff'd, 919 F.2d 549 (9th Cir. 1990). Judge David Kenyon certified the *Orantes* class on April 30, 1982.[2]

On April 29, 1988, Judge Kenyon entered a permanent injunction mandating that the INS use specific procedures when detaining, processing and removing Salvadoran immigrants. See *Orantes II*, 685 F.Supp. at 1511-13. The injunction required the government, *inter alia*, to (1) ensure that class members have access to counsel and to private attorney-client communications while in immigration detention; (2) allow class members to receive and possess legal materials, including legal mail; (3) give class members adequate access to law libraries; (4) give class members access to writing materials; (5) refrain from employing coercion when processing class members; (6) give class members up-to-date lists of low-cost or free legal services providers and make the lists freely available at detention locations; (7) give class members a specific advisal of their rights; and (8) make telephones available to detained class members.[3] *Id*. at 1511-13.

On November 28, 2005, the government filed a motion to dissolve the injunction.[4] After extended proceedings, the court granted the motion in part and denied it in part, dissolving four paragraphs but keeping all of the above provisions in place.[5] *Orantes-Hernandez v. Gonzales*

---

[2]The original class certified by Judge Kenyon encompassed not only Salvadorans who had been or would be in custody and were eligible to apply for political asylum, but also Salvadorans who, subsequent to June 2, 1980, requested, or would in the future request, political asylum, and whose claims had not yet been presented or adjudicated. See *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 355 (C.D. Cal. 1982) ("*Orantes I*"). Plaintiffs later abandoned claims on behalf of the second group of Salvadorans. *Orantes II*, 685 F.Supp. at 1491.

[3]On July 2, 1991, Judge Kenyon modified the injunction to add four conditions that applied solely to the Port Isabel Service Processing Center in Port Isabel, Texas. On September 28, 2004, the court entered a stipulated order clarifying that the Office of Refugee Resettlement could not violate that portion of the injunction that prohibited the government from transferring unrepresented class members outside the district where they were apprehended within seven days of their apprehension. (See Stipulation and Order, Docket No. 896 (Sept. 28, 2004).)

[4]Motion for Order to Dissolve Permanent Injunction ("Dissolve Motion"), Docket No. 704 (Nov. 28, 2005).

[5]See also Modified, Consolidated Injunction ("Modified Injunction"), Docket No. 855 (Nov. 26, 2007).

("*Orantes IV*"), 504 F.Supp.2d 825, 827 (C.D. Cal. 2007), aff'd sub nom *Orantes-Hernandez v. Holder* ("*Orantes V*"), 321 Fed.Appx. 625 (9th Cir. 2009).

On July 10, 2014, prompted by the government's initial response to the large influx of unaccompanied alien children[6] ("unaccompanied children" or "UAC") and families – many from El Salvador – who have recently been apprehended along the United States border with Mexico, plaintiffs filed an application for a temporary restraining order ("TRO").[7] The application seeks to have the court order the government to give class counsel a weekly list of the names, age, and gender of all class members detained at the Nogales Processing Center ("the NPC") in Nogales, Arizona, and to allow class counsel to visit class members at the NPC so they can determine whether the government is complying with the terms of the injunction cited above.[8] The government opposes the application.[9]

## I. FACTUAL BACKGROUND

### A. Facts Related to the Original Proceedings

At the time Judge Kenyon certified a class and entered a permanent injunction in this case, El Salvador was embroiled in a twelve-year civil war that killed an estimated 75,000 people between 1980 and 1992.[10] As a result of the war, there were rampant human rights abuses and

---

[6]An "unaccompanied alien child" is "a child who – (A) has no lawful immigration status in the Untied States; (B) has not attained 18 years of age; and (C) with respect to whom – (I) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

[7]Request for Temporary Restraining Order ("Application"), Docket No. 883 (July 10, 2014).

[8]*Id.*

[9]Defendants' Opposition to *Ex Parte* Application for Temporary Restraining Order ("Opposition"), Docket No. 890 (July 14, 2014).

[10]Dissolve Motion, Exh. F at 59 (U.S. Department of State, Background Note: El Salvador, Feb. 2005).

political violence in the country.[11] By 1988, in a country with a population of approximately five million, some 45,000 innocent civilians had been murdered by soldiers, security forces, and death squads. *Orantes II*, 685 F.Supp. at 1492. An additional 4,000 civilians had "disappeared." *Id*. Political dissidents and prisoners were subjected to arbitrary detention, arrest, intimidation, torture, and execution. *Id*. at 1492-93. Salvadoran civilians reported repeated bombings and ground attacks, forced relocation, and harassment by the military. *Id*. at 1493. Judge Kenyon concluded that, faced with these conditions, many Salvadorans made a decision "born of desperation" to enter the United States. *Orantes I*, 541 F.Supp. at 358. He found, moreover, that class members would suffer "the most serious of deprivations" if they were deported to "a country overrun with civil war, violence, and government-sanctioned terrorist organizations." *Id*. at 1504.

Given the civil war and human rights abuses in El Salvador, Judge Kenyon stated, many Salvadorans who entered the United States had a "well-founded fear of persecution" and "good faith claims to asylum." *Orantes II*, 685 F.Supp. at 1491. Despite this fact, he found, many Salvadorans were misled or coerced into giving up their right to request asylum by INS officers who "engaged in a pattern and practice of summarily removing Salvadorans from the country by obtaining their signatures on . . . voluntary departure form[s] through intimidation, threats, and misrepresentation." *Id*. at 1505. Once an individual consented to voluntary departure, he or she was subject to removal from the country without a deportation hearing or an opportunity to request asylum. *Id*. at 1494.

Judge Kenyon found that the INS' practices were the result of agents' misunderstanding of Salvadorans' reasons for coming to the United States, and Salvadorans' reluctance to communicate their traumatic experiences to INS officials. *Id*. at 1496-97. After hearing extensive testimony, Judge Kenyon concluded that many INS agents felt Salvadorans entered the U.S. "solely for economic gain" – an attitude that "reflect[ed] a lack of sensitivity . . . [born of] ignorance on the part of INS agents [regarding] the complex motivations and situations of those who ha[d] fled El Salvador." *Id*. at 1496. In addition, he found, Salvadorans who fled

---

[11] *Id*. at 60.

persecution by soldiers and guerillas in El Salvador felt uncomfortable confiding in "a uniformed officer of the United States . . . because [they were] aware that the United States support[ed] the Salvadoran government, which tolerate[d] and participate[d] in [the] acts of terror." *Id.* at 1497. Those Salvadorans who reached the United States often experienced psychological trauma or guilt because they had abandoned their country and their families; this made them reluctant to communicate their experiences to the INS agents who interviewed them. *Id.* Many also feared that the information they revealed would endanger family and friends who remained in El Salvador. *Id.* Judge Kenyon found that the INS knew of these problems and refused to compensate for them. *Id.*

Instead, he concluded, INS officers routinely told class members that "if they appl[ied] for asylum they [would] remain in detention for a long time," *id.* at 1494-95; "that Salvadorans [did] not get asylum," *id.* at 1495; that the "information on the [asylum] application [would] be sent to El Salvador," *id.*; see also *Orantes I*, 541 F.Supp. at 360; that they would be transferred to remote locations, *Orantes II*, 685 F.Supp. at 1495; and that women would be placed in a cell with men, where they might be sexually molested, *Orantes I*, 541 F.Supp. at 360.

Judge Kenyon found that such threats and misrepresentations were typically combined with deliberate withholding of information about the asylum process. He concluded that the INS routinely distributed legal services lists to Salvadorans that contained inaccurate, incomplete, or non-working telephone numbers for legal services agencies, *Orantes II*, 685 F.Supp. at 1497; that the agency failed to provide legal services lists to Salvadorans altogether, *id.* at 1498; and that it refused to advise Salvadorans of the availability of political asylum, even when they requested the opportunity to apply for asylum or recounted experiences that suggested eligibility for asylum, *id.* He also found that Salvadorans were "frequently singled out for transfer to distant facilities," where they were isolated from friends and relatives who could have assisted them. *Id.* at 1500.

Judge Kenyon heard extensive evidence that led him to conclude that INS officials regularly pressured Salvadorans to return to El Salvador, *id.* at 1501; severely limited Salvadorans' visitation opportunities with attorneys and paralegals, *id.*; failed to ensure Salvadorans' privacy during attorney-client interviews, *id.*; refused to provide legal materials, legal forms, law

libraries, and writing materials to Salvadorans, *id*. at 1501-02; restricted Salvadorans' access to telephones, *id*. at 1502; and segregated Salvadorans in solitary confinement without providing hearings, *id*.

Judge Kenyon concluded that the INS' "practice and pattern" of mistreating, pressuring, and intimidating Salvadorans into giving up their asylum claims was "widespread and pervasive," *id.* at 1505, and was "highly likely to result . . . in class members being deprived of their right[ ] to a deportation hearing," *id.* at 1496. This pattern and practice, he found, warranted the entry of permanent injunctive relief. *Id*. at 1505. The injunction Judge Kenyon entered required that the government give Salvadorans an advisal of rights, which came to be known as the *Orantes* advisal, as well as a list of organizations that provided free legal services. It also prohibited the INS from transferring unrepresented Salvadorans out of the district where they were arrested for a period of seven days, so that they could more easily retain attorneys. In addition to these measures, which were designed to ensure that Salvadorans received notice of their right to apply for asylum and had the ability to pursue it effectively, the injunction prescribed certain conditions of confinement for Salvadoran detainees, including hearings before they could be placed in solitary confinement, and regular access to legal materials, telephones, and legal professionals.[12]

Judge Kenyon based the advisal remedy on "three alternative and independent legal bases." See *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 556 (9th Cir. 1990) ("*Orantes III*"). "One [was] that notice [was] required as a matter of due process." *Id*. (citing *Orantes II*, 685 F.Supp. at 1506-07, Conclusions of Law 24-25). The second "[was] that notice [was] required in order to fully effectuate the intent of the Refugee Act." *Id*. (citing *Orantes II*, 685 F.Supp. at 1506, Conclusions of Law 19-23). The third and final basis for the remedy was that "notice [was] required . . . as a remedial measure to counteract the pattern of interference by the INS with the plaintiff class members' ability to exercise their right[ ]" to apply for asylum. *Id*. (citing *Orantes II*, 685 F.Supp. at 1507-08, Conclusions of Law 26-43). Judge Kenyon based the provisions of the injunction governing detention center conditions and the transfer of Salvadoran detainees to

---

[12]See Modified Injunction.

remote facilities on Salvdorans' right to retain counsel at non-government expense and to access the courts. *Orantes II*, 685 F.Supp. at 1510-11.

**B. Facts Related to the Instant Application**

Prior to the filing of plaintiffs' TRO, and other than ancillary proceedings concerning a motion for attorneys' fees, there had been no action in this case since 2007, when the court granted in part and denied in part the government's motion to dissolve the injunction and granted a motion to consolidate all current provisions of the permanent injunction in a single order.[13] *Orantes IV*, 504 F.Supp.2d at 825. The permanent injunction does not have a fixed termination date, however, and, as the government concedes, the *Orantes* injunction "has legal effect and imposes obligations on [the government's] handling of UACs from El Salvador."[14]

**1. Background Regarding Detention and Removal Proceedings of Unaccompanied Children**

In recent months, the number of unaccompanied children apprehended by CBP along the country's border with Mexico has increased dramatically: between October 1, 2013 and May 31, 2014, CBP apprehended 47,017 unaccompanied minors.[15] Of these 47,017 children, 9,850 were Salvadoran, representing a 707% increase in apprehensions of children from that country since 2009.[16] In a recent study involving interviews with 404 unaccompanied children from El Salvador, Guatemala, Honduras, and Mexico, the United Nations High Commissioner on Refugees ("UNHCR") concluded that of the 104 Salvadoran children interviewed, 72% were likely in need of international protection; 62% of the Salvadoran children interviewed stated that

---

[13] See Order Granting Motion to Consolidate All Current Provisions of Permanent Injunction in a Single Order, Docket No. 854 (Nov. 26, 2007); Modified Injunction.

[14] Opposition at 2.

[15] Declaration of Karen C. Tumlin in Support of Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order ("Tumlin Decl."), Exhibit M at 41 (Number of Latino Children Caught Trying to Enter U.S. Nearly Doubles in Less Than a Year).

[16] *Id.*

they had fled to the United States to escape violence perpetrated by gangs and other organized, armed criminal actors, while 21% said they had fled abuse in their home.

Under 8 U.S.C. § 1232(b)(3), enacted as part of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("the TVPRA"), unless there are exceptional circumstances, the border patrol is required to place unaccompanied children in the physical custody of the United States Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR") within 72 hours of their apprehension. See 8 U.S.C. § 1232(b)(3). ORR must then detain the minors "in the least restrictive setting that is in the best interest of the child," which typically means the children are first housed in child-specific facilities located across the country and then, if available, released to the care of a parent or suitable guardian pending disposition of their removal proceedings. See *id.*, § 1232(c)(2)(A). All unaccompanied children not from the contiguous countries of Mexico and Canada must be placed in removal proceedings under section 240 of the Immigration and Nationality Act ("INA") following their apprehension. *Id.*, § 1232(a)(5)(D)(I). Once in removal proceedings, the minors may apply for asylum, request voluntary departure, or apply for other forms of immigration relief. *Id.*, §§ 1158(b)(1)(A), 1232(A)(5)(D)(ii). If they do not qualify for any form of relief, an immigration judge will order their removal.

**2. The Government Opens Temporary Facilities to House the Influx of Unaccompanied Minors and Families**

To house the large number of unaccompanied children and families apprehended along the border in recent months, the government has located and opened temporary facilities throughout the United States, including the southwest. These facilities include the NPC, which is the subject of this application; Lackland Air Force Base ("Lackland") in San Antonio, Texas; the Ventura Naval Base ("Ventura") in Ventura, California; Fort Sill in Lawton, Oklahoma; and the Federal

Law Enforcement Training Center ("FLETC") in Artesia, New Mexico.[17] Ventura and Fort Sill are currently operated by HHS. NPC is run by CBP, and FLETC is run by ICE.[18]

Before being re-opened to house unaccompanied children on May 31, 2014, the NPC was an out-of-use CBP processing center.[19] It is a "large warehouse" in which the unaccompanied children are physically separated by gender and age in "open bays that facilitate constant monitoring."[20] The government reports that as of July 11, 2014, the average time an unaccompanied child is detained at the NPC before being transferred to HHS custody was 9 days.[21] On July 11, 2014, there were 968 unaccompanied children housed at the NPC, 330 of whom were from El Salvador.[22]

The facility has a Red Cross telephone bank with 40 telephones, located in a converted hallway.[23] Raleigh Leonard, the Division Chief of Operational Programs of the Tucson Sector of CBP and the official responsible for overseeing the NPC, states that the unaccompanied children held at the NPC may use these telephones "daily" to contact their attorneys, although telephone calls are limited to five minutes.[24] At some point, Leonard reports, unaccompanied

---

[17] *Id.*, Exhs. U (Hundreds of Migrant Youths Held at Texas Military Base (discussing Lackland Air Force Base)); V (SoCal Navy Base to House Children Caught Illegally Crossing Border (discussing Ventura Naval Base)); W at 197 (Obama Administration Acts to Ease Immigration Legal Crunch at Border (discussing Federal Law Enforcement Training Center)); X (Fort Sill to House 600 to 1,200 Migrant Children (discussing Fort Sill)).

[18] *Id.*, Exh. J (July 2, 2014 email from Sarah B. Fabian to Karen Tumlin and others).

[19] Declaration of Raleigh Leonard in Support of Defendants' Opposition to Application for Temporary Restraining Order ("Leonard Decl."), Docket No. 890-2 (July 14, 2014), ¶¶ 3-4.

[20] *Id.*, ¶ 7.

[21] Declaration of Woody A. Lee in Support of Opposition to Plaintiffs' Application for Temporary Restraining Order ("Lee Decl."), Docket No. 891 (July 14, 2014), ¶ 10.

[22] *Id.*, ¶ 6.

[23] *Id.*, ¶ 13.

[24] *Id.*

children held at the NPC are given a Form I-770, which states that the minor may contact relatives and may be represented by an attorney.[25] Where a child is under the age of 14 or is unable to understand the form, a border patrol agent is required by regulation to read and explain the document to the child in a language he or she understands. See 8 C.F.R. § 236.3(h). Although, as noted, unaccompanied children from non-contiguous countries must be placed in removal proceedings under the TVPRA, the Form I-770 erroneously states that a child "may choose to go back to [his or her] country without a hearing" before an immigration judge and provides a box the child can check next to the statement: "I do not want to have a hearing before a judge. I am in the United States illegally and ask that I be allowed to return to my country."[26] The form has a space for the child's country of nationality, signature, and date. In addition to providing the children with Form I-770, Woody Lee, the Deputy Chief of Operations for CBP, states that agency policy requires that the CBP provide all Salvadorans with an advisal of their rights as required by the injunction entered in this case and that it provide them a list of free legal services.[27]

No attorneys are given access to the NPC to speak with any of the unaccompanied children.[28] This includes immigration attorneys.[29] On June 16, 2014, Ruben Reyes, an attorney

---

[25]*Id.*

[26]*Id.*, Exh. A (Form I-770).

[27]Lee Decl., ¶¶ 13-14.

[28]Declaration of James Lyall in Support of *Ex Parte* Application for Temporary Restraining Order ("Lyall Decl."), Docket No. 883-8 (July 10, 2014), ¶ 5; Lee Decl., ¶ 16 ("Border Patrol facilities were designed to optimize law enforcement operations and are not equipped with secure rooms for privileged discussions between attorneys and clients. As such, border patrol stations do not normally provide for access to counsel"); Tumlin Decl., Exh. J (July 2, 2014 email from Fabian to Tumlin ("[W]e are unable to provide you with access to individual children at th[e] [NPC and FLETC] facilities. It is simply not possible given the nature of these facilities to provide such access in a way that ensures the protection of the interests and safety of the children involved").

[29]Declaration of Ruben Reyes in Support of *Ex Parte* Application for Temporary Restraining Order ("Reyes Decl."), Docket No. 883-9 (July 10, 2014).

with the American Immigration Attorneys Association contacted Brandon Cagle, Chief of External Communications for the Tucson Sector Field Communications Division of the CBP. Reyes told Cagle that he and other attorneys wished to visit the NPC to provide a "know-your-rights" presentation to the detained children, along with a one-page handout that summarized the information.[30] After requesting background information and indicating that he would vet Reyes and the other attorneys to determine if they could be granted access to the facility, Cagle referred Reyes to CBP Public Information Officer Nicole Ballistrea.[31] Ballistrea told Reyes that the vetting process had not been completed.[32] On June 19, 2014, Reyes went to the NPC and was denied access.[33] Later that day, Ballistrea telephoned Reyes and said that he and the other immigration attorneys would not be allowed to enter the facility, and that CBP would not grant access to attorneys wishing to give "know-your-rights" presentations.[34]

Leonard states that there are no physical locations in the NPC where private discussions could be conducted without negatively impacting CBP's ability to provide "essential care needs."[35] He states that the government is using all available space at the NPC and that, because it is a secure facility, it would be difficult to expand or convert other space to accommodate private meetings with individual minors.[36] He contends the staff working at the NPC have no private offices, and perform their duties at computer stations in a common area from which they can monitor the minors.[37] Although there are three "smaller open bay detention areas" at the NPC,

---

[30]*Id.*, ¶ 2.

[31]*Id.*, ¶¶ 3-5.

[32]*Id.*, ¶ 7.

[33]*Id.*, ¶ 9.

[34]*Id.*, ¶ 13.

[35]*Id.*, ¶ 14.

[36]*Id.*, ¶ 8.

[37]*Id.*, ¶ 9.

Leonard states that these areas are being used by the Guatemalan and Salvadoran consulates on a regular basis – for nine to twelve hours a day – and by the Honduran consulate on an "intermittent" basis.[38] The areas are not private and the consulates often interview unaccompanied minors in groups of five or six at a time.[39] Leonard states that the government has "made" space at the NPC for employees of the Federal Emergency Management Agency ("FEMA"), which is providing humanitarian support to the unaccompanied minors; this includes the organization of recreational activities.[40] He reports that the only enclosed "private area" at the facility is being used by HHS personnel, who provide medical screening and vaccinations from 5:00 a.m. to 8:00 p.m. every day to between 160 and 300 minors.[41]

Leonard's statements regarding the government's ability to create a space in which attorneys could meet with clients conflicts with representations made by A.L. Miller III, a CBP official working at the NPC, to James Lyall, a staff attorney at the American Civil Liberties Union of Arizona, on June 21, 2014 when Lyall toured the NPC. Lyall states Miller told him that "if an order came from the agency leadership to create a legal visitation area, local officials could do it 'pretty quickly.'"[42]

On June 30, 2014, President Barack Obama issued a letter titled "Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border." The President stated that he hoped to work with Congress to "provid[e] the DHS Secretary additional authority to exercise discretion in processing the return and removal of unaccompanied minor children from non-contiguous countries like Guatemala, Honduras, and El Salvador" as well as "an aggressive deterrence strategy focused on the removal and repatriation of recent border

[38] *Id.*, ¶ 10.

[39] *Id.*

[40] *Id.*, ¶ 12.

[41] *Id.*, ¶ 11.

[42] Lyall Decl., ¶ 5.

crossers."[43] President Obama said he sought "statutory changes that . . . [would] make it easier to deport children back to Guatemala, El Salvador, and Honduras" and would "expedite" the processing of unaccompanied children's claims.[44] On July 15, 2014, Senator John Cornyn referred to the Senate Committee on Homeland Security and Governmental Affairs a new bill, the Helping Unaccompanied Minors and Alleviating National Emergency Act ("HUMANE Act"), which would, *inter alia*, amend the TVPRA to provide for faster removal of unaccompanied children from non-contiguous countries.[45] H.R. 5114, S. 2611, 113th Cong. (2d Session 2014).

**3. Class Counsel Attempt to Meet with Class Members at the NPC**

Following media reports regarding the opening of the NPC and other temporary facilities the government is using to house unaccompanied children and following President Obama's statements, class counsel contacted the Department of Justice, Office of Immigration Litigation ("OIL"), in an attempt to determine whether the facilities were in compliance with the terms of the injunction. On June 16, 2014, class counsel Karen Tumlin emailed a copy of the injunction to OIL attorney August Flentje.[46] Tumlin wrote Flentje again on June 18, 2014. In the second email, Tumlin stated that, given media reports and photographs class counsel had seen of the inside of some of the temporary facilities, they were concerned that the facilities did not comply

---

[43]Tumlin Decl., Exh. Z (Letter from the President – Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nations Southwest Border).

[44]*Id.*, Exh. EE (Most Children Illegally Crossing the Border Alone Will Be Deported, White House Signals).

[45]See http://thomas.loc.gov/cgi-bin/bdquery/z?d113:SN02611:@@@X (accessed on July 17, 2014). The court takes judicial notice of this information from the Library of Congress website. See *Daniels-Hall v. National Education Association,* 620 F.3d 992, 999 (9th Cir. 2010) (taking judicial notice of information displayed on the website of two school districts because they were government entities); *Paralyzed Veterans of Am. v. McPherson*, No. C 06–4670, 2008 WL 4183981, *5 (N.D. Cal. Sept. 8, 2008) ("Information on government agency websites has often been treated as properly subject to judicial notice").

[46]Tumlin Decl., Exh. A (June 16, 2014 email from Tumlin to Flentje).

with the injunction.[47] Tumlin asked that OIL give class counsel a list of the centers in which Salvadoran minors were being held, as well as a list of the number of children being detained at each facility and their nationality. She also asked that counsel be permitted to inspect the facilities, beginning with Ventura.[48]

On June 24, 2014, Flentje responded that "the government entities handling the current exceptional circumstances are aware of the[ ] requirements [imposed by the *Orantes* injunction]."[49] Flentje referred Tumlin to FEMA, which he said was the agency responsible for coordinating tours of the new facilities.[50] Tumlin called the telephone number for FEMA that Flentje provided, but the person who answered indicated that her office had no role in coordinating visits to the facilities.[51] Tumlin reported this to Flentje in a June 25, 2014 email, and requested assistance in securing permission to visit Ventura.[52] Flentje responded that his office would look into it.[53]

On June 27, 2014, Tumlin wrote Flentje again, and asked that the government allow class counsel to tour the Ventura, NPC, and Fort Sill facilities and speak with any class members who wanted to speak with them.[54] On June 30, 2014, OIL attorney Sarah Fabian responded, stating that class counsel's request to meet with individual class members "raised serious concerns and questions for the government," and that the government believed it was "highly unlikely" the *Orantes* injunction conferred a right on class counsel to meet with class members.[55] She said:

---

[47] *Id.*, Exh. B (June 18, 2014 email from Tumlin to Flentje).

[48] *Id.*

[49] *Id.*, Exh. C (June 24, 2014 email from Flentje to Tumlin).

[50] *Id.*

[51] *Id.*, Exh. D (June 25, 2014 email from Tumlin to Flentje).

[52] *Id.*

[53] *Id.*, Exh. E (June 25, 2014 email from Flentje to Tumlin).

[54] *Id.*, Exh. F (June 27, 2014 email from Tumlin to Flentje).

[55] *Id.*, Exh. G at 24 (June 30, 2014 email from Sarah Fabian to Tumlin).

"While we understand that you seek access on the basis of your role as class counsel for these injunction proceedings, we would need further explanation of how that role, and/or the legal requirements of the injunction, would necessitate this access."[56] Fabian stated that the government could "try to facilitate" a general visit to the facilities, but that he could not guarantee it would be possible.[57] On July 1, 2014, Tumlin sent an email asserting that "[a]s class counsel in *Orantes* . . . , we have a right to speak with our class members where they are detained to monitor and ensure compliance with the injunction[ ][.]"[58] On July 2, 2014, Fabian responded that the government would offer class counsel a guided tour of the NPC and FLETC facilities, but would not allow class counsel to speak with class members because "it is simply not possible given the nature of these facilities to provide such access in a way that ensures the protection of the interests and safety of the children involved."[59] Fabian also denied class counsel's request to speak with class members detained at the facilities because, he asserted, the government did "not believe such access is required under the Orantes . . . injunction[ ]."[60] Fabian offered "to work with [class counsel] to identify information that the Government could provide that would allow [them] to monitor compliance with the[ ] injunction[ ]."[61]

On July 3, 2014, Tumlin wrote Fabian, stating that class counsel would accept the government's offer to allow them to tour the NPC and FLETC facilities.[62] She stated that class counsel disagreed with the government's view that they did not have a right to meet with class members, and asked that they be allowed to meet with 25 children who agreed to speak with them

---

[56] *Id.* at 25.

[57] *Id.* at 24.

[58] *Id.*, Exh. H at 28 (July 1, 2014 email from Tumlin to Fabian and Flentje).

[59] *Id.*, Exh. J (July 2, 2014 email from Fabian to Tumlin).

[60] *Id.*

[61] *Id.*

[62] *Id.*, Exh. K (July 3, 2014 email from Tumlin to Fabian).

while they were at the NPC.[63] Tumlin stated that class counsel was willing to work with the government to identify the least burdensome manner of conducting class member interviews, e.g., by conducting simultaneous interviews and limiting the visit to one day.[64] Tumlin stated that "[g]iven that compliance with core portions of the injunction[ ] cannot be assessed based on written information alone, we believe that it is essential that we be permitted access to speak to our detained class[.]"[65] Fabian responded on July 8, 2014, stating that "[f]or the reasons [she had] previously explained[,] [the government would] not be able to schedule meetings with individual children as part of th[e] tour [of NPC], but . . . [would] provide [counsel] with a general tour of the [ ] facility.[66]

Following receipt of this email, class counsel filed this TRO.[67] They ask that the court order the government to (1) cease denying class counsel reasonable access to class members at the NPC; (2) allow class counsel reasonable access to class members within 5 business days; (3) allow class counsel to speak privately with any class member at NPC who consents; and (4) provide class counsel with updated, weekly lists of the names, age, and gender of all class members detained at the NPC.[68]

## II. DISCUSSION

### A. Legal Standard Governing Issuance of Temporary Restraining Orders

The standard for issuing a temporary restraining order is the same as that for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839

---

[63]*Id.*

[64]*Id.*

[65]*Id.*

[66]*Id.*, Exh. L (July 8, 2014 Email from Fabian to Tumlin).

[67]*Id.*, ¶ 2.

[68]Application at 3.

n. 7 (9th Cir. 2001); *Ali v. United States*, 932 F.Supp. 1206, 1208 (N.D. Cal. 1996). A "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 676 (2008), and a district court should enter preliminary injunctive relief only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Such a showing requires that plaintiff establish it is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. See *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Winter*, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest"). See also *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest,'" quoting *Winter*, 555 U.S. at 20); *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits," citing *Winter*, 555 U.S. at 20); *Timbisha Shoshone Tribe v. Kennedy*, 687 F.Supp.2d 1171, 1182 (E.D. Cal. 2009) ("Pursuant to *Winter*, [p]laintiffs must make a clear showing that they are likely to succeed on the merits").

Prior to the Supreme Court's decision in *Winter*, the Ninth Circuit held that to prevail on a motion for preliminary injunction, a plaintiff had to demonstrate:

> "either: (1) a likelihood of success on the merits and the *possibility* of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be shown." *Stormans, Inc.*, *586* F.3d at 1127 (quoting *Clear Channel*

*Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003) (emphasis original)).

The *Winter* Court "definitively refuted" the Ninth Circuit's "possibility of irreparable injury" standard. *Id.* It held that the "'possibility' standard [was] too lenient," and that "plaintiffs seeking preliminary relief [have] to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis original). Following *Winter*, the Ninth Circuit has held that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *American Trucking Associations*, 559 F.3d at 1052 (footnote omitted).

It has thus articulated an alternate formulation of the sliding scale test. Post-*Winter*, serious questions going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff also shows there is a likelihood of irreparable injury and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("To the extent prior cases applying the 'serious questions' test have held that a preliminary injunction may issue where the plaintiff shows only that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by *Winter*, which requires the plaintiff to make a showing on all four prongs. . . . But the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test. That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest").

**B. Whether Plaintiffs' Application Seeks an Appropriate Temporary Restraining Order**

Plaintiffs argue that the government's refusal to allow class counsel to speak with class members detained at the NPC violates class members' rights under the injunction, as well as their due process right to access the courts and their First Amendment right to speak with their attorney. They contend they have an attorney-client relationship with class members and the government

is unreasonably burdening that relationship by refusing to allow class counsel to speak with class members detained at the NPC.[69]

The government counters that the application is an improper use of the temporary restraining order mechanism. It disputes plaintiffs' contention that the injunction gives class members the right to speak with class counsel to determine whether the government is in compliance with the injunction. For that reason, it argues, and because class counsel also assert that the government's conduct violates class members' due process and First Amendment rights, seeking a temporary restraining order is inappropriate because the application seeks to have the court recognize rights not previously at issue rather than preserve the status quo.[70]

The court agrees with the government that plaintiffs' application is an improper use of the temporary restraining order mechanism. A motion or application for injunctive relief "must be based upon a cause of action, such as a constitutional violation[.] . . . 'There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed.R.Civ.P. 12(b)(6) (failure to state a claim).'" *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005) (citing *Klay v. United Healthgroup, Inc.*, 376 F.3D 1092, 1097 (11th Cir. 2004)); see also *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (explaining that a plaintiff "had no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his original complaint"); *In re Ohio Execution Protocol Litigation*, No. 2:11–cv–1016, 2012 WL 1883919, *3 (S.D. Ohio May 22, 2012) ("A party pursuing injunctive relief is confined to arguing the merits of his or her complaint").

Plaintiffs' application is not based on the underlying causes of action asserted in this case. The application does not seek injunctive relief related to the claims in the original complaint. Plaintiffs' assertion that class counsel have a right to speak with class members is essentially a

---

[69]Application at 10.

[70]Opposition at 2.

request for post-judgment discovery that might support a request that the court hold the government in contempt of the injunction.

Their contention that the government's refusal to allow class counsel to meet with class members violates the class members' due process and First Amendment rights is a new claim that has not previously been asserted in this case. It is true that the Supreme Court has held that prisoners have a due process right to access the courts to file civil rights complaints alleging violations of their constitutional rights. It is also true that interfering with the attorney-client relationship burdens that right and may be the basis for a claim that the right is violated. See *Procunier v. Martinez*, 416 U.S. 396, 419-420 (1974) ("The constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights. This means that inmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid. . . . The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials"), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989).

This case does not involve the rights of detained immigrants to bring civil rights lawsuits, however. It involves the rights of Salvadoran detainees to apply for asylum and have a removal hearing. Thus, the portion of plaintiffs' application that seeks an order allowing class counsel to speak with class members because of a violation of their due process or First Amendment rights is based on a claim that, if it is to be raised, must be raised in a separate lawsuit. See *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) ("It is self-evident that Devose's motion for temporary relief has nothing to do with preserving the district court's decision-making power over the merits of Devose's 42 U.S.C. § 1983 lawsuit. To the contrary, Devose's motion is based on new assertions of mistreatment that are entirely different from the claim raised and the relief requested in his inadequate medical treatment lawsuit. Although these new assertions might

support additional claims against the same prison officials, they cannot provide the basis for a preliminary injunction in this lawsuit"); *Faust v. Cabral*, Civil Action No. 12–11020–DJC, 2013 WL 3933021, *10 (D. Mass. July 30, 2013) ("The[ ] claims [supporting an application for preliminary injunction] are unrelated to the allegations contained in the complaint, and thus cannot serve as the basis for Faust's motion for a preliminary injunction"); *Silva v. McKenna*, No. C11–5629 RBL/KLS, 2012 WL 4846259, *5 (W.D. Wash. Sept. 12, 2012) ("Injunctive relief is to be used to address issues related to the underlying violations presented in the complaint. . . . Plaintiff was previously advised that any issues raised in a motion for injunctive relief must be related to the issues raised in his complaint. He has failed to establish any relationship between his asserted injury and the conduct asserted in his amended complaint. Instead, he alleges new conduct not related to this litigation"); *Lopez v. Wall*, No. C.A. 09–578 S, 2010 WL 4225896, *3 (D.R.I. Aug. 19, 2010) ("Plaintiff does not include any allegations regarding the June 4 Incident in the Complaint, and, therefore, has no chance of succeeding on the merits of the allegations in the [preliminary injunction] motion"). Compare *McClendon v. City of Albuquerque*, 272 F.Supp.2d 1250, 1253 (D.N.M. 2003) (granting a preliminary injunction in a prisoner class action asserting that unlawful conditions of confinement had continued despite the parties' entry into a settlement agreement). The court cannot grant injunctive relief on claims that have not been asserted before it.

For these reasons, the court agrees with the government that, to the extent plaintiffs seek to have the court restrain the government from denying class counsel access to class members, the application must be denied. Because the matter is briefed, however, and the evidence reveals extensive communications between the parties regarding the extent of any right class members have to speak with class counsel, the court construes the portion of the application that seeks an order allowing class counsel to communicate with class members detained at the NPC and to receive weekly lists of class members detained there in order to ensure compliance with the injunction as a motion to compel post-judgment discovery.

### C. Whether the Court Should Grant Plaintiffs' Motion to Compel Post-Judgment Discovery

#### 1. Whether the Permanent Injunction Gives Class Members a Right to Speak with Class Counsel[71]

While the court agrees with the government that plaintiffs' application does not seek a proper temporary restraining order, it does not agree with the government's assertion that class members have no right under the permanent injunction to speak with class counsel. Such a right is implied in the permanent injunction; without the ability to speak with class members to some extent, class counsel would be unable to execute their duty to "fairly and adequately represent the interests of the class," FED.R.CIV.PROC. 23(g)(4), because their ability to ensure compliance with the permanent injunction would be hampered.

Moreover, implying a right on the part of class members to speak with class counsel in the permanent injunction also aids the court's exercise of its jurisdiction to enforce the permanent injunction. Although the case is closed, the court retains jurisdiction to the extent necessary to enforce its prior orders, including, most importantly, the permanent injunction. "District courts do, and must, have the authority to punish contemptuous violations of their orders." *Reebok International Ltd. v. McLaughlin*, 49 F.3d 1387, 1390 (9th Cir. 1995), cert. denied, 516 U.S. 908 (1995); see also *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831 (1994) ("Courts independently must be vested with 'power to impose . . . submission to their lawful mandates'" (internal citation omitted)). A court must be able to make appropriate orders

---

[71]Given the government's apparent willingness to produce certain documents to class counsel – discussed *infra* – and given that neither party addresses why class counsel are entitled to a weekly list of names, ages, and genders of class members detained at the NPC or why the provision of such information would be unduly burdensome, the court declines at this point to address the matter. The parties are therefore directed to meet and confer and submit a joint report no later than **July 23, 2014**, as to whether the government will provide this information to class counsel and, if it is not willing to do so, whether the parties have come to a satisfactory compromise resolution of the issue. If the parties are not able to agree, each should set forth in the joint report its views as to whether or why the information must be provided. They should also detail why, or why not, the production of such a document would be unduly burdensome.

in furtherance of its jurisdiction, whether or not the order to be enforced explicitly provides mechanisms by which the court can ensure compliance. See *Saga International, Inc. v. John D. Brush & Co.,* 984 F.Supp. 1283, 1285 n. 1 (C.D. Cal. 1997) ("Although the settlement agreement provides for the court's continuing jurisdiction 'for the purposes of any contempt proceeding,' the court would have continuing jurisdiction to enforce a permanent injunction, regardless of such express reservation by the parties"). Stated differently, because the court has authority to punish contemptuous violations of its orders, it also has authority to grant or deny motions or applications seeking orders that would assist it in exercising that jurisdiction.

Here, as noted, plaintiffs seek an order that will allow them to assess the government's compliance with the terms of the permanent injunction. Cf. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (citing class counsel's ability to return to court if defendant does not comply with settlement agreement). Although the permanent injunction does not explicitly grant class counsel the right to speak with class members, such a right must be implied, at least to some extent, because it aids the court enforcement of the permanent injunction and allows class counsel to fulfill their duty adequately to represent the interests of the class under Rule 23(g).

**2. Legal Standard Governing Plaintiffs' Discovery Request**

The remaining question, of course, is the scope of class counsel's right to engage in post-judgment discovery by speaking with class members. There is little case law that addresses a court's ability to aid its enforcement of an injunction by authorizing post-judgment discovery. As a general matter, however, "[b]road discretion is vested in the trial court to permit or deny discovery." *Goehring v. Brophy*, 94 F.3d 1294, 1305 (9th Cir. 1996); see also *Kenney v. United States*, 458 F.3d 1025, 1032 (9th Cir. 2006) ("The district court enjoys broad powers in equity"). Under Rule 26(b)(2), courts must weigh the burden or expense of proposed discovery against its likely benefit, taking into account "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." FED.R.CIV.PROC. 26(b)(2); see also *Green v. Baca*, 219 F.R.D. 485, 493 (C.D. Cal. 2003) (affirming a magistrate judge's order that required a county sheriff to produce documents related to the county's "overdetention" policy, and noting

that "plaintiff's need for information regarding defendant's customs and policies outweighs the likely burden in producing such evidence because the evidence, which concerns important constitutional issues, is critical to plaintiff's ability to prove his case. Defendant, moreover, has not made a convincing argument that the burden of collecting such information will strain its fiscal or staff resources"); *Playboy Enterprises, Inc. v. Welles*, 60 F.Supp.2d 1050, 1053-54 (S.D. Cal. 1999) ("In determining whether a request for discovery will be unduly burdensome to the responding party, the court weighs the benefit and burden of the discovery. . . . This balance requires a court to consider the needs of the case, the amount in controversy, the importance of the issues at stake, the potential for finding relevant material and the importance of the proposed discovery in resolving the issues").

Plaintiffs' request is not a typical discovery request because it does not seek to compel the government to provide information, but rather to compel the government to allow counsel to talk with their own clients. As plaintiffs argue – and the government does not dispute[72] – class counsel have an attorney-client relationship with members of the certified class; these members include Salvadoran children detained at the NPC. See, e.g., *Staton v. Boeing*, 327 F.3d 938, 959 (9th Cir. 2003) (referring to class members as "class counsel's clients"); *Fidel v. National Union Fire Insurance Company of Pittsburgh, PA*, 105 F.3d 664, 1996 WL 742482, *7 (9th Cir. Dec. 19, 1996) (Unpub. Disp.) ("The attorney-client relationship between class counsel and appellants began, at a minimum, when the class was certified on June 23, 1989"); *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("The class is not the client. The class attorney continues to have responsibilities to each individual member of the class even when negotiating settlement"); *Moreno v. Autozone, Inc.*, No. C05-04432 MJJ, 2007 WL 4287517, *7 (N.D. Cal. Dec. 6, 2007) ("Upon final approval, every Martinez class member who declined to opt-out or object to the settlement formed an attorney-client relationship with the court-appointed counsel"); *Parks v. Eastwood Insurance Services, Inc.*, 235 F.Supp.2d 1082,

[72]Opposition at 15 ("[E]ven if it is conceded that there is an attorney-client relationship between class counsel and any UAC being processed through the NPC. . .").

1083 (C.D. Cal. 2002) ("In a class action certified under Rule 23, absent class members are considered represented by class counsel unless they choose to 'opt out'"); *Huston v. Imperial Credit Commercial Mortgage Investment Corp.*, 179 F.Supp.2d 1157, 1167 (C.D. Cal. 2001) ("[I]n certifying a class action, the Court confers on absent persons the status of litigants and 'creates an attorney-client relationship between those persons and a lawyer or group of lawyers'" (internal citation omitted)); *Resnick v. American Dental Association*, 95 F.R.D. 372, 376 (N.D. Ill. 1982) ("ADA's claim that no lawyer-client relationship exists here fares no better. . . . Without question the unnamed class members, once the class has been certified, are 'represented by' the class counsel. Class counsel have the fiduciary responsibility and all the other hallmarks of a lawyer representing a client"); see also *R.D. Legal Funding Partners, LP v. Robinson*, 476 Fed. Appx. 354, 361 (11th Cir. Apr. 18, 2012) (Unpub. Disp.) ("[T]he district court correctly found facts establishing the existence of an attorney-client relationship between Robinson and the *McLendon* plaintiff class"); *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1207 n. 28 (11th Cir. 1985) ("At a minimum, class counsel represents all class members as soon as a class is certified . . . if not sooner").

There is more case law concerning a court's ability to manage and restrict communications between class counsel and class members than there is regarding the court's ability to order post-judgment discovery. Case law addressing a court's ability to restrict class counsel's communication with class members is relevant because, if the court were to deny plaintiffs' motion, it would essentially be condoning defendants' refusal to allow class counsel to speak with class members. Under Rule 23(d), "the court may issue orders that . . . impose conditions on the representative parties." FED.R.CIV.PROC. 23(d). The court may not, however, prevent class counsel from speaking with class members "absent a clear and particularized showing of a need for [such a] prohibition." *Montgomery v. Aetna Plywood, Inc.*, No. 95 C 3193, 1996 WL 189347, *6 (N.D. Ill. Apr. 16, 1996) (citing *Gulf Oil Company v. Bernard*, 452 U.S. 89 (1981)). In *Gulf Oil,* the Supreme Court considered a district court's order that prevented class counsel and named plaintiffs from contacting prospective class members. The court noted that the order interfered with class counsel's efforts to inform potential class members of the suit and made it

more difficult for counsel to obtain information about the merits of the case from the individuals they sought to represent. 452 U.S. at 101. The Court held

> "[b]ecause of these potential problems, an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 101-02.

Thus, a district court should not restrict communications between class counsel and class members if the restriction "'create[s] at least potential difficulties for [plaintiffs] as they [seek] to vindicate the legal rights of a class.'" *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1440 (9th Cir. 1984) (citing *Gulf Oil*,452 U.S. at 101); see also *A.J. by L.B. v. Kierst*, 56 F.3d 849, 856-57 (8th Cir. 1995) (holding that a district court erred when it banned class counsel from speaking with class members – juvenile pretrial detainees who challenged the constitutionality of conditions at a juvenile facility – absent a showing that the information sought was not available from other sources and that there was a compelling need to contact class members because "juveniles' perceptions of the institution, its staff, and its programs [were] relevant components of a comprehensive evaluation of institutional policy," "the district court made no discernible effort to weigh the state's interest in protecting the confidentiality of juveniles against the potential interference with the class members' rights" and it made "no findings of fact with respect to whether plaintiffs' counsel were engaged in or likely to engage in abusive tactics . . . [or] whether access would be disruptive of administrative procedures at the JCJJC or would otherwise compromise the safety of the juveniles and staff").

The Ninth Circuit has recognized that the principal concerns that warrant imposing restrictions on communications with class members are "(1) solicitation of direct representation

of class members who are not formal parties, (2) solicitation of funds and agreements to pay fees, (3) solicitation by defendants of requests to opt out, and (4) communications which may be confusing or misleading, or create an impression which reflects adversely on the court." *Domingo*, 727 F.2d at 1440 (citing the Manual for Complex Litigation). As is apparent from this list, "[t]he abuses at which communication[ ] restrictions are aimed arise from the fact that the class representative and his counsel may have interests that are in conflict with those of the class members." *Id.* at 1441. Because class counsel's and class members' interests are aligned following certification, however, "[i]f anything, the policies weighing in favor of communication[ ] restrictions after the class has been certified are much less compelling than before certification." *Id.* at 1440.

In combination, the court's ability to impose conditions on class counsel's communications with class members under Rule 23(d), its ability to order a party to respond to discovery under Rule 26(b), and the case law cited above indicates that determining whether class counsel should be permitted to speak with class members at the NPC requires balancing counsel's need to consult with class members to obtain information regarding the government's compliance or non-compliance with the injunction against the risk of abuse posed by such communications and the burden it would impose on the government.

**3. Class Counsel's Need to Speak with Class Members**

Class counsel contend that media reports regarding the conditions at the NPC and other new facilities, as well as President Obama's stated intention of expanding resources and broadening authority to expedite removal of unaccompanied children and families indicates that the government either is or will soon be violating the terms of the injunction.[73] For that reason, they assert, they must be allowed to speak with class members.[74] The government counters that

---

[73]Application at 16-18.

[74]*Id.* at 18.

class counsel should not be permitted to speak with class members because plaintiffs have not adduced "a shred of evidence that the Government is violating the Orantes injunction."[75]

The court disagrees with the government's assertion that class counsel have presented no evidence that it is violating the terms of the injunction. As plaintiffs have shown, and the government concedes, immigration attorneys are not allowed to visit clients at the NPC.[76] The injunction specifically requires that the government "[a]llow counsel or paralegals working under the supervision of counsel reasonable access to class members between the hours of 9:00 a.m. and 9:30 p.m."[77] The injunction does not distinguish between government agencies or types of detention or detainees. Rather, it requires that defendants provide all class members reasonable access to immigration counsel.

The government argues that it is in compliance with the injunction because class members detained at the NPC may use the telephones to contact their attorneys. The portion of the *Orantes* injunction that concerns immigration attorneys' access to class members contemplates in-person meetings, however. See *Orantes I*, 685 F.Supp. at 1501, 1511 (finding that "limited daytime attorney visitation hours at several detention centers . . . severely limit[s] the ability of attorneys and paralegals to conduct interviews with their clients. Limitations on visiting hours at Los Fresnos and El Centro violate the intent of the court orders applicable to those locations" and

---

[75]Opposition at 16.

[76]Lyall Decl., ¶ 5 ("Mr. Miller informed me that attorneys were not given access to the [NPC] facility as a matter of U.S. Customs and Border Patrol (CBP) policy"); Lee Decl., ¶ 16 ("Border Patrol facilities were designed to optimize law enforcement operations and are not equipped with secure rooms for privileged discussions between attorneys and clients. As such, border patrol stations do not normally provide for access to counsel"); Tumlin Decl., Exh. J (July 2, 2014 email from Fabian to Tumlin ("[W]e are unable to provide you with access to individual children at th[e] [NPC and FLETC] facilities. It is simply not possible given the nature of these facilities to provide such access in a way that ensures the protection of the interests and safety of the children involved"); see also Reyes Decl., ¶ 13 ("I was informed by Ms. Ballistrea that we would not be allowed into the facility and that the facility in Nogales would not be accessible to attorneys for the purpose requested [i.e., to give know-your-rights presentations]").

[77]Modified Injunction, ¶ 7.d.

concluding that defendants had violated the preliminary injunction by "unduly restricting attorney and paralegal visitation, [and by] failing to provide private telephone *and* visitation facilities" (emphasis added)). Accordingly, plaintiffs have adduced evidence that the government is not complying with this provision of the injunction at the NPC.

The government also appears to argue that the injunction does not apply to the NPC because it is a "temporary facility." The injunction does not discriminate between facilities, however. It applies to all class members wherever they are detained; it repeatedly refers generally to "detention centers" and "detention facilities."[78] Indeed, the unlawful pressure or coercion about which the class complained in 1982 took place during processing by INS or CBP agents; this most likely occurred shortly after the class members were detained and taken to temporary processing centers like NPC, as opposed to longer-term ICE or HHS detention facilities. See *id.* at 1494. The government does not argue that the NPC is not a detention center/facility. Indeed, the name of the facility – the Nogales Processing *Center* – and the fact that it is used to detain unaccompanied children make clear that it is a detention center/facility to which the injunction applies.

The government, moreover, has adduced evidence indicating that it may possibly be violating the injunction by providing inadequate telephone access to any class members detained at the NPC who have already obtained a lawyer. The injunction provides that "[o]nce a written notice of appearance has been made by an attorney on behalf of any member of the plaintiff class, Defendants shall: . . . [p]rovide at least one telephone per twenty-five (25) detainees at detention centers. Defendants shall ensure the privacy of attorney-client communications, through the use of privacy panels between telephones or other effective means [designed] . . . to ensure the utmost confidentiality between detainees and their legal representatives."[79] The government reports that

---

[78]See *id.*, ¶¶ 1.j, 5.c., 7.e., 8-9, 11.b.

[79]*Id.*, ¶ 7.e.

there are 968 unaccompanied children at the NPC and 40 telephones.[80] There is therefore one telephone for every 24.2 children; even if all of the children are already represented by counsel, this complies with the injunction. Although Leonard states that the children can use the telephones "daily," and contact their attorneys via telephone, he indicates that each telephone call is limited to five minutes. It is unclear, moreover, whether his reference to "daily" means that the telephones are operational each day and a child may use them as frequently as he or she wishes, or whether it means that a child is given the opportunity to have one, five-minute telephone conversation daily. If it is the latter, the telephone access the unaccompanied children have to their immigration attorneys may be insufficient under the injunction.

Leonard, moreover, reports that the telephone banks are in a "converted hallway." The court questions whether telephones in a converted hallway give represented class members sufficient privacy to allow them to have confidential conversations with their attorneys. For all of these reasons, the court concludes that plaintiffs have adduced some evidence that the government may be violating the provisions of the injunction that require reasonable attorney-client visitation and telephone access.

The court agrees with the government, however, that to the extent plaintiffs rely on the action President Obama might ask Congress to take or any changes Congress may make to the existing law, their arguments are speculative and do not demonstrate that the government has violated, or very shortly will violate the terms of the injunction. Plaintiffs apparently believe that President Obama's desire to expedite the removal of unaccompanied children means that CBP agents or other government officials will pressure class members to agree voluntarily to depart from the country in lieu of seeking asylum. Other than newspaper articles reporting that President Obama intends to seek a change in the law, plaintiffs have submitted no evidence supporting this assertion. The articles do not indicate that President Obama has directed CBP agents to pressure class members to request voluntary departure in lieu of applying for asylum, however. It is too speculative to conclude, based on the fact that President Obama may seek a change in the law or

[80] Leonard Decl., ¶ 13.

that members of Congress have introduced legislation that would speed up the removal process, if passed, that CBP and/or ICE agents are currently pressuring class members to waive their right to apply for asylum. To the extent plaintiffs argue that if Congress amends the TVPRA to treat class members the same way that Mexican or Canadian children are treated, there will be a greater risk that the government will violate the injunction by pressuring child class members to return to El Salvador without having a hearing before an immigration judge, this argument, too, is entirely speculative and based on events that have not transpired. The likelihood that these events will occur, moreover, is unclear. The court therefore finds these arguments that the government is not complying with the injunction unavailing.

Given that there is some evidence the government may currently be violating certain aspects of the injunction and given that the government is apparently treating the NPC facility differently than other, more established facilities for unaccompanied children, the court concludes that plaintiffs have demonstrated that there is a need for class counsel to speak with class members to investigate further whether the government is in compliance with the injunction.

The government argues that permitting class counsel to meet with class members at the NPC would provide "only an incomplete snapshot of the experience of class members," and that a more effective way to monitor compliance with the injunction would be for the government to provide class counsel with data regarding the class members.[81] It may be true that interviewing class members will provide an incomplete picture of government compliance. The court cannot conclude on the present record, however, that this justifies or necessitates denying plaintiffs' request. Discussions with class members may reveal evidence that cannot be captured simply by reviewing available government statistics.

Class members' perceptions of the NPC and its staff "are relevant components [in] a comprehensive evaluation of" whether the government is complying with the injunction. *A.J.*, 56 F.3d at 856. Discussions with class members may provide relevant evidence concerning the extent to which class members are able to communicate with their immigration attorneys on the

---

[81]Opposition at 25 n. 10.

telephone and whether those communications are private. It is also possible class members will reveal other violations of the injunction. It is possible, for example, that they will report they were pressured by the NPC staff to apply for voluntary departure once in removal proceedings rather than pursuing asylum.[82]

#### 4. The Risk of Abuse Posed by Communications Between Class Counsel and Class Members

Because a class has been certified in this case, the class members' interests appear to be aligned with class counsel's interest such that the concerns identified by the *Domingo* court are not an issue. The government does not argue that class counsel's motivation for seeking to speak with class members is improper or that allowing them to do so otherwise poses a risk of abuse of

---

[82]As the court has noted, unaccompanied children who are class members must be placed in removal proceedings, during which they will have the opportunity to apply for asylum or seek voluntary departure. Although a child must now seek voluntary departure from an immigration judge, this does not mean – as the government appears to argue – that CBP agents cannot coerce a child to do so.

There is no evidence as to whether class members are in immigration proceedings while detained at the NPC. Nor is there any persuasive evidence that an unaccompanied minor will stay at the NPC on average 9 days for the entire time the facility is in use. CBP officers working at the NPC may thus be in a position to discuss with a class member his or her right to apply for asylum while the class member is in immigration proceedings and in the process of making decisions as to whether he or she will pursue some form of immigration relief. Certainly, CBP officers could make statements to such children that would be coercive under the terms of the injunction. Merely because there are now additional protections available for children in removal proceedings under the TVPRA, moreover, does not mean that a CBP officer can no longer make a statement that is coercive.

As noted, moreover, many class members will be released to the care of parents or other guardians once they have been placed in HHS custody. Class members do not have a right to a government-provided attorney. It is therefore possible that coercion exercised by government agents while class members are detained at the NPC might persuade those individuals who cannot afford an attorney or cannot locate one to provide pro bono assistance once they are released from custody to forego an asylum application and to instead request voluntary departure. Currently, there is no evidence that the government has been coercing class members to abandon asylum claims. By speaking with class members, however, class counsel may discover evidence that this is occurring and be able to cite this as proof that the injunction is being violated.

the class action device. Accordingly, there does not appear to be a risk of abuse if class counsel are allowed to speak with class members.

**5. The Burden on the Government of Allowing Class Counsel to Speak with Class Members at the NPC**

As noted, the government argues that it would be burdensome if the court ordered that class counsel be allowed to speak with class members detained at NPC. Leonard states that the government is using all available space at the NPC and that, because it is a secure facility, it would be difficult to expand or convert other space to accommodate private meetings between counsel and individual minors.[83] Leonard reports that the only private space in the facility is in use by HHS personnel, who provide medical care there from 5:00 a.m. to 8:00 p.m. every day. He states that, although there are three smaller open bay detention areas, these are in use for nine to twelve hours a day by the Guatemalan, Salvadoran, and less frequently, the Honduran consulates.[84] As a result, Leonard concludes, there are no physical locations in the NPC where counsel could have private discussions with class members without negatively impacting CBP's ability to provide "essential care needs."[85] Leonard also states that

> "[g]iven the nature of the population at the NPC, Border Patrol must take into consideration not only the safety of the UACs currently housed at the NPC, but also visitors, and those charged with caring for them. . . . As with any detention facility, and considering that the majority of its population is males between the ages of 13-17, Border Patrol must take into account the inherent safety risks of permitting individuals access to its facilities. Thus, any individual access would

---

[83]Leonard Decl., ¶ 8.

[84]*Id.*, ¶¶ 9-12.

[85]*Id.*, ¶ 14.

require additional agents to escort and maintain situational awareness of the visitor, both for the safety of the UAC, [and] also [of] the visitor."[86]

Overall, it is clear from Leonard's and Lee's declarations that the NPC is, at best, an imperfect facility in which to detain the unprecedented number of children being apprehended crossing the border while providing for their basic needs.

The government, moreover, has legitimate concerns about the children's safety, given that it is detaining almost 1,000 children at the NPC facility, and given that the composition of the population changes frequently. Leonard, however, does not assert that it would be unsafe to allow class counsel to speak with children detained at the NPC. Instead, he appears to contend that allowing class counsel to access the facility to meet with class members would require that the government expend additional resources. He provides no facts indicating that it would be unduly burdensome for the government to expend the resources required, however – e.g., to bring additional agents to the site or modify existing space.

Leonard does assert that it would be difficult to create a space for class counsel to meet confidentially with class members at the NPC. As noted, his statements in this regard conflict with Lyall's report, who states that CBP agent Miller told him officials could create a legal visitation area at the NPC "pretty quickly."[87] Even crediting Leonard's statement that there is little, if any, room at the NPC for confidential attorney-client meeting space,[88] he does not describe the burden on the government if the court were to order it to provide private visitation

---

[86]*Id.*, ¶¶ 18-19.

[87]Lyall Decl., ¶ 5.

[88]Despite the fact that the parties have presented conflicting evidence, the court need not hold a hearing on the temporary restraining order. See 11A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2949 n. 33 (2d ed. 2014) ("The Ninth Circuit rule that a hearing may be denied even when the parties request one and when the written evidence is in conflict necessarily implies that a preliminary injunction may be granted on contradictory written evidence alone"); see also *Pang-Tsu Mow v. Republic of China*, 201 F.2d 195, 199 (D.C. Cir. 1953) (holding that the trial court could properly grant preliminary injunction on the basis of a detailed affidavit, exhibits, and verified complaint although some facts were controverted by defendants' affidavits).

space for class counsel at the NPC. Nor does Leonard contend it would be unsafe or prohibitively expensive to require the government to bring class members to an outside location for the purposes of interviews with class counsel.

**6. Balancing Class Counsel's Need for Discovery with the Burden on the Government**

Balancing class counsel's need to speak with class members to ensure that the government is complying with the injunction against the risk of abuse the burden on the government of facilitating such communication, the court concludes that ordering some amount of access is appropriate. As noted, there is no concrete evidence that the government is violating the provisions of the injunction that prohibit the government from coercing class members to waive their right to seek asylum in the United States. There is, however, some evidence that the government may be violating ancillary provisions of the injunction designed to ensure that such coercion does not occur. Furthermore, the record supports an inference that ordering discussions between class counsel and class members may develop evidence as to whether or not the government is abiding by all of the terms of the injunction.

Balanced against class counsel's need to speak with class members for these reasons, there is no evidence that allowing such communications would pose a risk of abuse of the class action device. There is, however, evidence that, given the challenges posed by the recent surge in the number of unaccompanied minors crossing the border, there are physical and operational limits on the government's ability to give class counsel unfettered access to class members willing to speak with them. Balancing these considerations, the court concludes that it is appropriate to direct that class counsel be allowed to speak with 25 willing class members during a one-day visit to the NPC. If it is impossible for the government to find space at the NPC for meetings between class counsel and class members, the government is directed to identify a space outside the facility where the meetings can occur. The meetings are to occur as soon as practicable, and in no event later than **July 30, 2014**. To assist class counsel in determining whether the 25 individuals with whom they meet are representative of detained class members as a whole, the government is

directed to provide class counsel with a list of the names, ages, and genders of all of the class members detained at the NPC on the day class counsel visit.

## III. CONCLUSION

For the reasons stated, plaintiffs have not demonstrated their entitlement to a temporary restraining order and their application is denied. The court, however, construes plaintiffs' first argument in support of the application as a motion to compel post-judgment discovery, and grants this aspect of the application. The government is directed to allow class counsel to interview 25 class members at the NPC during a one-day visit as soon as is practicable, but in no event later than **July 30, 2014**. These interviews must be private and may occur on or off the NPC site. To assist counsel in determining whether 25 individuals with whom they are permitted to speak are representative, the government is directed to provide class counsel with a list of the names, ages, and genders of all class members detained at the NPC on the day class counsel visit.

The court declines to decide whether class counsel are entitled to receive weekly lists of the names, ages, and genders of class members detained at the NPC until the parties have met and conferred regarding the issue. The parties are directed meet and confer and file a joint report no later than **July 23, 2014**, as to whether the government will provide this information to class counsel and, if it is not willing to do so, whether the parties have come to a satisfactory compromise resolution of the issue. If the parties are not able to agree, each should set forth in the joint report its views as to whether or why the information must be provided. They should also detail why, or why not, the production of such a document would be unduly burdensome.

To the extent plaintiffs seek additional discovery in anticipation of any contemplated motion to compel compliance with the injunction, class counsel is directed to meet and confer with the government regarding any discovery requests prior to filing a motion to compel discovery. The

court expects the parties to attempt to resolve the matter between themselves. Any future motions to compel discovery must be filed in the first instance before Magistrate Judge Kenton.

DATED: July 17, 2014

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE